**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2068-21

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

KURT V. SMITH,
a/k/a WILFREDO PEREZ,
KURT U. SMITH, and
KURT J. SMITH,

     Defendant-Appellant.

_____

Argued December 4, 2023 – Decided December 14, 2023

Before Judges Mawla and Marczyk.

On appeal from the Superior Court of New Jersey, Law Division, Burlington County, Indictment No. 19-01-0059.

Austin J. Howard, Assistant Deputy Public Defender, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Austin J. Howard, of counsel and on the briefs).

Nicole Handy, Assistant Prosecutor, argued the cause for respondent (LaChia L. Bradshaw, Burlington

County Prosecutor, attorney; Nicole Handy, of counsel and on the brief).

PER CURIAM

A jury found defendant Kurt V. Smith guilty of two counts of reckless manslaughter, N.J.S.A. 2C:11-4(b)(1), for starting a fire, which resulted in the death of his elderly mother and her companion. Defendant appeals from his convictions on grounds the State failed to preserve exculpatory evidence, challenges the admission of the State's fire expert's testimony, and contests his sentence. We affirm in part and remand in part, for the reasons expressed herein.

Defendant resided with his mother and her companion at her home in Pemberton Township. The State adduced testimony from defendant's friend, Jerome Bland. He explained that on October 16, 2018, defendant and two acquaintances were in the garage attached to the home "messing with [defendant's] motorcycle." When Bland arrived at the home, he let himself in the front door and called for defendant but did not get a response. While searching for defendant, Bland saw defendant's mother and her companion sleeping in bed. Bland eventually heard defendant's voice emanating from the garage and went there.

Seconds after entering the garage, Bland smelled strong gasoline fumes. He told defendant he could smell gasoline and asked, "What are you trying to

do, start a fire?"  Defendant responded, "Do you want to see a fire?  I'll show you a fire" and took a lighter out of his pocket, lit it, and dropped it to the ground.  A fire started and immediately spread to both side walls, running down to the motorcycle, which also caught fire.

Defendant immediately asked one of his friends to hand him a fire extinguisher and he attempted to put the fire out.  Bland left the garage and tried to awaken defendant's mother and her companion without success.  He returned to the garage and observed defendant open the garage door to drag the motorcycle out, which caused "the whole house [to light] up like a Christmas tree out of hell."  Bland again tried, but failed, to awaken defendant's mother and her companion.  He then exited the home and tried to put out the fire with the garden hose.  Once he realized his efforts were futile, he tried again to rouse defendant's mother and her companion.  Bland emphasized, "the whole time, [defendant] was still trying to put the fire out . . . ."

Bland called 9-1-1 but did not wait for police because he was afraid his prior criminal record would lead police to believe he started the fire. Firefighters removed the bodies of defendant's mother and her companion from the home. The Burlington County Chief Medical Examiner testified both victims died of smoke and soot inhalation, and thermal burns.

A-2068-21

The following day, Detective Brian Lloyd of the Burlington County Prosecutor's Office and Captain Stephen Letts of the New Jersey State Fire Marshal's Office investigated and documented the scene. Inside the garage, they found a fire extinguisher and observed water on the garage floor with a "sheen" or "rainbow color," which they each testified was "indicative" of an ignitable liquid accelerant. They found the motorcycle inside the garage near the door with debris on top of it and its rubber melted off. Melissa Balogh, a forensic scientist employed by the New Jersey State Police Office of Forensics, testified she examined defendant's right work boot, which he wore the night of the fire, and testing revealed gasoline on the bottom of the boot.

A grand jury indicted defendant with two counts of first-degree aggravated manslaughter, N.J.S.A. 2C:11-4(a)(1) (counts one and two); and one count of third-degree arson, N.J.S.A. 2C:17-1(b)(1) (count three). Prior to trial, defendant moved to suppress Captain Letts's expert report and testimony regarding the origin and cause of the fire. The motion judge granted the motion in part, ruling the portion of the opinion concluding the fire was deliberately set by defendant would be inadmissible. Defendant also moved to dismiss the indictment or, alternatively, for an adverse-inference jury instruction based on the State's failure to preserve potentially exculpatory evidence after the

4

Township demolished the property where the fire occurred without notice to the defense. The judge denied the motion.

The jury trial and sentencing were handled by a different judge. The jury acquitted defendant of the aggravated manslaughter charges but found him guilty of the lesser-included offenses of reckless manslaughter. It deadlocked on the arson charge.

The trial judge denied defendant's motion for a new trial, which claimed Captain Letts improperly opined about the cause of the fire. The judge granted the State's motion to sentence defendant to an extended term of imprisonment as a persistent offender.

On February 10, 2022, the judge sentenced defendant on the reckless manslaughter convictions to two concurrent eleven-year prison terms, with an eighty-five percent parole bar pursuant to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2. The judge found aggravating factors three, six, and nine and mitigating factor two—concluding the aggravating factors substantially outweighed the mitigating factors. The State dismissed the arson count.

Defendant raises the following arguments on appeal:

> POINT I   THE STATE DENIED DEFENDANT HIS
> RIGHTS    TO    DUE    PROCESS    AND
> CONFRONTATION    BY    DESTROYING
> POTENTIALLY    EXCULPATORY    EVIDENCE

WITHOUT NOTICE TO THE DEFENSE AND IN DEFIANCE OF REPEATED PRESERVATION REQUESTS.  (Partially Raised Below).

A.    The Untested Motorcycle Was Highly Material Evidence Because the State's Expert Admitted that It Remained a "Possible" Cause of the Fire that He Never Ruled Out.

B.    The State's Destruction of a "Possible" Cause of the Fire Manifestly Prejudiced the Defense Because It Prevented Defendant from Investigating His Theory of the Fire's Cause and from Adequately Confronting the State's Expert.

C.    The Destruction of the Crime Scene Without Notice to the Defense — Despite Repeated Preservation Requests — Constitutes Bad Faith.

1.    Communications Show that the State Had Actual Notice of the Defense's Preservation Requests, but It Destroyed the Evidence Anyway Without Notice to the Defense.

2.    The State's Destruction of Potentially Exculpatory Evidence Was in Bad Faith Because It Disregarded Repeated Preservation Requests, Selectively Preserved Other Evidence, and Refused to Provide Notice of the Demolition Date.

D.    The Proper Relief Is Dismissal of the Indictment with Prejudice.  Alternatively, a New Trial Is Required.

6

POINT II THE ADMISSION OF THE STATE'S FIRE EXPERT'S OPINIONS VIOLATED NUMEROUS EVIDENTIARY PROHIBITIONS AND DENIED DEFENDANT A FAIR TRIAL. (Partially Raised Below).

A. The State's Fire Expert Should Have Been Barred from Offering Any Expert Opinion Because He Was Also the Lead Fact Investigator. (Raised Below).

B. The State's Fire Expert's Causation Opinion Violated N.J.R.E. 702 Because It Merely Parroted the Claim of a Testifying Eyewitness, Which Was Not Beyond the Ken of the Jury.

C. The State's Fire Expert's Causation Opinion Violated N.J.R.E. 703 Because He Relied on Double Hearsay Without Evaluating Its Reliability in Violation of Professional Fire Investigation Standards. (Not Raised Below).

D. The State's Fire Expert's Opinion that a Visible "Sheen" Was "Indicative" of a Liquid Accelerant — Without Any Testing — Was Not a Generally Accepted Scientific Option. (Not Raised Below).

E. Admitting the Opinions Was Not Harmless and Was Plain Error Because They Bolstered the Credibility of the State's Sole Eyewitness.

POINT III REVERSAL IS REQUIRED ON FUNDAMENTAL-FAIRNESS AND CUMULATIVE-ERROR GROUNDS. (NOT RAISED BELOW).

POINT IV ALTERNATIVELY, DEFENDANT'S SENTENCE IS EXCESSIVE.

7

## I.

Defendant argues he was deprived of due process and the right of confrontation because the State destroyed exculpatory evidence when it demolished his mother's home and the motorcycle, despite repeated preservation requests. He claims he should have been able to have an expert test the motorcycle's electrical system and petcock valve[1] because the defense theory was an electrical short ignited the fuel leaking from the valve. Defendant argues access to this evidence was vital to rebut the State's case—which was predicated on Bland's testimony that defendant ignited the fire—because Bland lacked credibility. Defendant asserts Bland was an unruly witness, left the scene on the day of the incident, and has a criminal record of his own, including an arson conviction.

The evidence was also important because Captain Letts admitted the fire could have been caused by an electrical short. Another investigator testified the petcock valve was "barely attached to the threads of the gas tank," which he believed would cause gas to leak out quickly. Additionally, Detective Lloyd admitted the motorcycle's gas tank did not have a gas cap and the petcock valve

---

[1] A petcock is "a small shut-off valve used to control the flow of liquid or gas." Wikipedia, the Free Encyclopedia, Petcock, at https://en.wikipedia.org/wiki/Petcock (last visited Dec. 6, 2023).

A-2068-21

was loose.  Defendant argues, taken together, this evidence supports his theory the fire was accidental.

Defendant argues the court should have granted his motion to dismiss the indictment.  Alternatively, we should remand for a new trial and suppress the portions of Captain Letts's opinion that cannot be challenged due to the lost evidence.  Notwithstanding the spoliation, defendant contends the court should have charged the jury that it could draw an adverse inference against the State, given its destruction of the evidence.

To determine if a due process violation has occurred in the instance of loss, destruction, or suppression of physical evidence in a criminal trial, courts consider:  (1) "whether there was bad faith . . . on the part of the government"; (2) "whether the evidence . . . was sufficiently material to the defense"; and (3) "whether [the] defendant was prejudiced by the loss or destruction of the evidence."   State v. M.B., 471 N.J. Super. 376, 382-83 (App. Div. 2022) (alteration in original) (quoting State v. Hollander, 201 N.J. Super. 453, 479 (App. Div. 1985)).  Generally, if a defendant does not prove "bad faith on the part of the State, 'failure to preserve potentially useful evidence does not constitute a denial of due process of law.'"  Id. at 382 (quoting George v. City of Newark, 384 N.J. Super. 232, 243 (App. Div. 2006)).

Bad faith has been found when destruction of evidence was "a conscious effort to suppress exculpatory evidence." State v. Serret, 198 N.J. Super. 21, 26 (App. Div. 1984).  Bad faith can also be the result of "egregious carelessness," which we have defined as "[conspicuously] bad, flagrant" conduct.  State v. Carter, 185 N.J. Super. 576, 580-81 (App. Div. 1982).  Our Supreme Court recently held bad faith does not require intentional misconduct.  State v. Zadroga, ____ N.J. ___ (2023) (slip op. at 19-33).

On December 3, 2018, the Pemberton Township construction official emailed the director of the township's department of community development, advising the property was "in danger of imminent collapse and failure" and a mandatory demolition date was required by November 2018.  However, no demolition was set yet.  On December 19, 2018, defense counsel left a voice mail with the township asking officials to return his call and advise "what the demolition plans are if any."

On December 22, 2018, defendant wrote to the township code enforcement officer from jail and copied the prosecutor.  His letter advised that the township did not have his permission "to tamper with, destroy or trespass on the . . . property" and warned against destroying evidence.  On December 28, 2018, the township chief of police sent an email to the prosecutor attaching

defendant's letter advising the township wished to demolish the home because the "construction official . . . deemed it a public safety hazard." The chief asked the prosecutor to advise what his office's position was on the demolition. On January 2, 2019, the prosecutor responded he would contact defense counsel "to tell him . . . the scene is extremely dangerous and needs to be demolished as soon as possible and then give [the defense] a very brief timeline to get done what he needs to do." The prosecutor, in turn, emailed defense counsel and advised as follows: "The home is in horrible shape and is a public danger. If you are retaining an expert[,] could you let me know so I can advise Pemberton [Township] on how to proceed with regard to demolition." On January 4, 2019, the prosecutor emailed the chief advising he had spoken with defense counsel who

> advised that he wants to retain an expert to look at the property prior to it being demolished but he needs approval from his supervisor who is currently out of the office. (That being said he advised . . . that he does not believe that he will be granted permission to retain an expert). His supervisor will be in next week and he should have a final answer at that time.

On January 10, 2019, the prosecutor emailed defense counsel and asked: "Any word yet on whether you will be retaining an expert and the demolition of the home?" On February 9, 2019, defense counsel wrote to the township's

11

construction official inquiring whether the demolition had "occurred and, if not, if [a] date has been set . . . ." Counsel requested "the house not be destroyed until [the defense] . . . had an opportunity to have an arson expert examine the property before any planned demolition."

On February 13, 2019, the prosecutor advised the chief defendant "has a new attorney who is now renewing the request that the property not be demolished until he has an expert look at the premises." The chief responded "[t]he property has not been touched as per the request of [defense counsel]." The prosecutor then emailed defense counsel inquiring if he had a time frame to inspect the property. The prosecutor explained the reason for his question was the township "is concerned with the hazard that the property poses given its current condition and the potential liability that it poses." He explained he told prior defense counsel the same thing and prior counsel "didn't feel as though the [public defender's o]ffice would retain an expert." The prosecutor asked defense counsel to let him know as soon as possible about the time frame to inspect the property.

On April 18, 2019, the State provided the fire marshal's report to defense counsel. Internal emails between township officials dated May 14, 2019, showed a growing concern with the property because it had become a dumping

12

ground for trash. The emails reflect the township had refrained from demolishing the property at the defense's request. The home was ultimately demolished on June 26, 2019.

Defendant moved to dismiss the indictment on grounds the State failed to preserve the evidence by allowing the home to be demolished. The motion judge issued a detailed written opinion, and concluded the State had not acted in bad faith because it gave defendant "ample opportunity to retain an expert and investigate the scene prior to the home's destruction . . . ." The home was not demolished until seven months after the fire. Moreover, the State was in regular contact with the defense regarding the fact township officials wanted to demolish the property because it was unsafe and had become a dumping ground. The judge found "[e]ven if the State did act in bad faith, [d]efendant failed to meet the remaining burden by showing the evidence had material exculpatory value prior to its destruction, or that destruction of the home unduly prejudiced [d]efendant." The judge noted defendant was not "denied the opportunity to do independent research and investigation [and] . . . there was no way to know whether the home had some exculpatory value prior to its destruction." Defendant did not make "a showing that the evidence destroyed would have played a significant role in his defense." Regardless, defendant could still retain

an expert to examine the evidence and refute the State's expert report, including cross-examination of the State's witnesses. However, the judge concluded "[w]hether the home had fire detectors, whether building materials may have accelerated the fire, or whether the petcock valve on the motorcycle was leaking gas do not negate any of the elements of the crime and are thus not exculpatory."

Having thoroughly reviewed the record, we conclude the motion judge's findings were sound and the State did not deprive defendant of due process warranting either dismissal of the indictment or a new trial. The facts do not support the conclusion the State either acted in bad faith or that its conduct was egregious and flagrant. There were legitimate public safety concerns about the home, and the record shows the State was in constant contact with defense counsel inquiring about plans to inspect the property and kept the defense apprised of the deteriorating nature of the home and delaying its demolition so a defense expert could inspect it.

Defendant argues Detective Lloyd's testimony established the petcock valve was loose and potentially leaking gas. He asserts Captain Letts's conclusions on the source of the ignition were based solely on Bland's report and inadmissible. Therefore, the motorcycle was critical evidence because its electrical system had potential exculpatory value. We are unpersuaded.

14

"Evidence is material 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" State v. Robertson, 438 N.J. Super. 47, 67 (App. Div. 2014) (quoting State v. Knight, 145 N.J. 233, 246 (1996)). The record does not support defendant's speculative theory of causation.

Captain Letts testified he did not rule out an electrical short as the cause of the fire. However, he also stated "[he] had no evidence of the motorcycle causing the fire." Although Captain Letts acknowledged a lab could have analyzed the motorcycle's electrical system, the record does not demonstrate a reasonable probability the electrical system was intact following the fire to permit such an analysis.

Defendant has not convinced us the destruction of evidence manifestly prejudiced his case. The destruction of the alleged exculpatory evidence ignores Bland's unrebutted eyewitness testimony that defendant caused the fire by tossing a lighter on the ground.

Nor are we persuaded defendant's confrontation rights were violated. As the motion judge aptly noted, the destruction of evidence did not prevent defendant from performing "independent research and investigation based upon the State's [expert] report." Defendant's expert could have reviewed the State's

evidence and refuted the State's theory of the case. The defense could also cross-examine the State's witnesses regarding the cause of the fire. The trial transcript reflects defense counsel did so by cross-examining Captain Letts about the fact he inferred the source of ignition by relying on Bland's statement that he saw defendant throw a lighter. Moreover, the defense also cross-examined Bland. However, the jury clearly credited the State's evidence. Defendant received a fair trial.

## II.

Defendant contends the admission of Captain Letts's expert's opinion that the cause of the fire was incendiary was prejudicial because he was both the expert and the lead investigator, and the dual role improperly bolstered his credibility. Defendant also argues Captain Letts's causation opinion violated N.J.R.E. 702 because it was not beyond the ken of the jury. Defendant further contends Captain Letts's opinion violated N.J.R.E. 703 because it relied on double hearsay since he did not interview Bland or review his sworn testimony, and instead derived what Bland saw from a detective's report. He claims Captain Letts improperly bolstered Bland's testimony. Further, Captain Letts's opinion that the sheen on the water in the property was evidence of an accelerant was

16

improper under N.J.R.E. 703 because it did not rely upon facts or data reasonably relied upon by experts in the field.

We review a trial court's evidentiary rulings under a deferential standard and will "uphold [the trial court's] determinations 'absent a showing of an abuse of discretion.'" State v. Scott, 229 N.J. 469, 479 (2017) (quoting State v. Perry, 225 N.J. 222, 233 (2016)). Under that standard, "[a] reviewing court must not 'substitute its own judgment for that of the trial court' unless there was a 'clear error in judgment'—a ruling 'so wide of the mark that a manifest denial of justice resulted.'" Ibid. (quoting State v. Marrero, 148 N.J. 469, 484 (1997)). We disregard harmless errors, but errors capable of causing an unjust result the jury "otherwise might not have reached" require reversal. State v. Prall, 231 N.J. 567, 581 (2018) (quoting State v. Daniels, 182 N.J. 80, 95 (2004)). "When a defendant fails to object to an error or raise an issue before the trial court, we review for plain error." State v. Ross, 229 N.J. 389, 407 (2017) (citing R. 2:10-2).

"The admission or exclusion of expert testimony is committed to the sound discretion of the trial court." Townsend v. Pierre, 221 N.J. 36, 52 (2015). "N.J.R.E. 703 addresses the foundation for expert testimony." Id. at 53. Expert testimony is admissible if it "will assist the trier of fact to understand the

evidence or to determine a fact in issue . . . ."  N.J.R.E. 702.  Expert testimony must be based on "(1) the expert's personal observations, or (2) evidence admitted at the trial, or (3) data relied upon by the expert which is not necessarily admissible in evidence but which is the type of data normally relied upon by experts."  Townsend, 221 N.J. at 53 (quoting Polzo v. Cnty. of Essex, 196 N.J. 569, 583 (2008)).

In State v. Torres, our Supreme Court cautioned that even when a witness may be qualified to give an expert opinion, "the court should carefully weigh whether the prejudicial effect of that evidence outweighs its probative value." 183 N.J. 554, 580 (2005) (citing State v. Harvey, 151 N.J. 117, 184 (1997)). "[W]hen the expert witness is an investigating officer, the expert opinion may present significant danger of undue prejudice because the qualification of the officer as an expert may lend credibility to the officer's fact testimony regarding the investigation."  Ibid.  As a result, Torres requires trial courts exercise their discretion to limit the scope of such testimony by giving a limiting instruction to the jury "that conveys to the jury its absolute prerogative to reject both the expert's opinion and the version of the facts consistent with that opinion."  Ibid. (quoting State v. Berry, 140 N.J. 280, 304 (1995)).

After Captain Letts testified the fire "was intentionally set, [and was] an incendiary fire[,]" defense counsel timely objected. Following a sidebar, the trial judge gave the following limiting instruction:

> I am going to instruct that you disregard and put no weight to the last portion of the testimony of Captain Letts with regard to the determination that the fire was intentionally set. That will be within your purview as the finders of fact in this matter.
>
> At the end of case, I will provide additional instructions touching on this exact issue, but I am ordering you to disregard the testimony with regard to that statement, the last statement by Captain Letts, the witness indicating that it was his opinion based on his analysis that the fire was intentionally set.

The trial judge's limiting instruction was timely, correct, and adequately instructed the jury to ignore the prejudicial aspect of Captain Letts's testimony. "[W]e trust juries to follow instructions." State v. Short, 131 N.J. 47, 65 (1993). The record does not convince us the jury failed to follow the judge's instructions.

Captain Letts primarily testified on other matters beyond the ken of the jury. He explained he ruled out other household items as potential causes of the fire, his assessment of the fire's movement and intensity throughout the house, and his assessment of the fire's origin. The State did not ask Captain Letts about the lighter as the source of ignition during direct examination. This information was adduced during the defense's cross-examination, which repeatedly asked

19

whether the cause of the fire was a lighter, if he searched for a lighter on the scene, and the likelihood of a lighter surviving a fire.

We reject the assertion Captain Letts's expert opinion did not meet the standards of N.J.R.E. 703 regarding his reliance on Bland's statement. At trial, Captain Letts was examined by the defense regarding the National Fire Protection Association Guide for Fire and Explosion Investigations (NFPA 921) standard, which are guidelines used in fire investigations. NFPA 921 states:

> [A] fire explosion investigation may include all or some of the following tasks: scene inspection or review of previous scene documentation done by others; scene documentation through photography and diagramming; evidence recognition, documentation, and preservation; witness interviews; review and analysis of the investigation of others; and identification and collection of data from other appropriate sources.
>
> [NFPA 921 § 4.4.3.2]

NFPA 921 § 19.2.1 states that in some investigations, "a single item, such as an irrefutable article of physical evidence or a credible eyewitness to the ignition . . . may be the basis for a determination of cause." However, this section also provides "no single item is sufficient in itself to allow determination of the fire cause. The investigator should use all available resources to develop fire cause hypotheses and to determine which hypotheses fit all of the credible data available." Ibid.

Having considered the record in light of these standards, we are convinced Captain Letts's testimony met the requirements of N.J.R.E. 703. He did not rely solely on Bland's statement, and instead testified that the eyewitness statements were corroborated by the physical evidence, including his inspection of the scene and the gasoline on defendant's boot. These elements, taken together, led him to rule out other causes of the fire.

Captain Letts's and Detective Lloyd's testimony about the "sheen" only stated it was indicative of an accelerant. This testimony was corroborated by the fact defendant's shoe had gasoline on it and Bland's testimony pointing to gasoline fumes in the garage. Regardless, the defense was able to cross-examine the witnesses regarding the probity of the sheen. This testimony did not unduly prejudice the jury's ability to draw its own conclusions.

## III.

When multiple errors are alleged, "the predicate for relief for cumulative error must be that the probable effect of the cumulative error was to render the underlying trial unfair." State v. Wakefield, 190 N.J. 397, 538 (2007). Even where a defendant alleges multiple errors, "the theory of cumulative error will still not apply where no error was prejudicial and the trial was fair." State v.

21

Weaver, 219 N.J. 131, 155 (2014). The errors alleged by defendant, individually and taken together, do not convince us he received an unfair trial.

IV.

Defendant challenges his sentence, arguing the judge failed to adequately explain his basis for finding the aggravating factors, and should have found mitigating factor eight. He claims the judge failed to provide any explanation for finding aggravating factors six and nine and found factor three solely based on defendant's criminal history. Further, the judge did not "explain the weight [he] assigned to the factors [he] found." Defendant notes factor three should have been accorded little weight because his criminal history primarily comprised municipal violations and third- and fourth-degree convictions. He claims the judge enhanced his sentence based on his prior contacts with law enforcement, which had resulted in dismissed or unindicted charges.

Defendant argues the court violated N.J.S.A. 2C:43-2(f)(1) and Rule 3:21-4(k) because it did not explain on the record the real-time period of parole ineligibility when it imposed the sentence pursuant to NERA. He asserts we have previously ordered a resentencing when the court did not refer to the NERA ineligibility term. State v. Ramsey, 415 N.J. Super. 257, 271-72 (App. Div. 2010).

Sentencing decisions are discretionary in nature. State v. Cuff, 239 N.J. 321, 347 (2019). We review a sentence for an abuse of discretion, deferring to the sentencing court's factual findings, and should not second-guess them. State v. Jones, 232 N.J. 308, 318 (2018); State v. Case, 220 N.J. 49, 65 (2014). We "must affirm the sentence of a trial court unless: (1) the sentencing guidelines were violated; (2) the findings of aggravating and mitigating factors were not 'based upon competent credible evidence in the record;' or (3) 'the application of the guidelines to the facts' of the case 'shock[s] the judicial conscience.'" State v. Bolvito, 217 N.J. 221, 228 (2014) (alteration in original) (quoting State v. Roth, 95 N.J. 334, 364-65 (1984)). "To facilitate meaningful appellate review, trial judges must explain how they arrived at a particular sentence." Case, 220 N.J. at 65.

Defendant was sentenced to an extended term as a persistent offender. The judge imposed concurrent eleven-year prison terms on both counts of second-degree reckless-manslaughter, with an eighty-five percent parole bar pursuant to NERA. He found aggravating factors three (risk of re-offense), N.J.S.A. 2C:44-1(a)(3); six (extent of prior criminal history), N.J.S.A. 2C:44-1(a)(6); and nine (need for deterrence), N.J.S.A. 2C:44-1(a)(9). He also found

mitigating factor two (defendant did not contemplate that his conduct would cause serious harm), N.J.S.A. 2C:44-1(b)(2).

The judge qualitatively analyzed the aggravating and mitigating factors as follows:

> [I]n reviewing the presentence report and the submissions of counsel [the court] does find clearly that aggravating factor [three] exists, the risk that [defendant] will commit another offense. There are contacts with the court going back to 1977 and as outlined in the presentence report the contacts with law enforcement have been consistent, frequent, and basically . . . since 1977.
>
> The [c]ourt finds aggravating factor [six] could be applicable here. And of course that is the extent of . . . defendant's prior criminal record, and the seriousness of the offenses for which he has been convicted. And the [c]ourt also finds aggravating factor [nine], the need to deter the defendant and others from violating the law.
>
> In this matter the [c]ourt could only find one lone mitigating factor, and that is mitigating factor [two]. That [defendant] did not contemplate that his conduct would cause, or threaten serious harm. And the [c]ourt finds that here based upon the lengthy criminal history and the application of the aggravating and mitigating factors that the aggravating factors preponderate over the lone mitigating factor. They substantially outweigh the mitigating factors.

The judge declined to impose consecutive sentences and reasoned as follows:

A-2068-21

[W]hile [defendant] has been convicted of these two counts . . . the [c]ourt recognizes that [defendant] also attempted to, at least from the [c]ourt's perspective, attempted to put out the fire and attempt[ed] to rescue the individuals who ultimately succumbed to the fire. And so[,] the [c]ourt does weigh that and it does not impose a significantly more severe sentence in consideration of that.    But [defendant's] criminal history is abhorrent, but ultimately the [c]ourt's determination for the extended term and the term of imprisonment reflects the facts and circumstances as the [c]ourt finds them to be.

We are satisfied the judge made adequate findings regarding the aggravating and mitigating factors.  The record supports the factors the judge found, and he explained the weight given to them.  Defendant's argument that the court should have considered mitigating factor eight (defendant's conduct was the result of circumstances unlikely to recur) is unsupported by the record.

N.J.S.A. 2C:43-2(f) states:

The court shall explain the parole laws as they apply to the sentence and shall state:

(1) the approximate period of time in years and months the defendant will serve in custody before parole eligibility;

(2) the jail credits or the amount of time the defendant has already served;

(3) that the defendant may be entitled to good time and work credits; and

25

(4) that the defendant may be eligible for participation in the Intensive Supervision Program.

The record lacks an explanation of the real-time parole consequences of defendant's sentence. They are not mentioned in defendant's sentencing memorandum. And the only mention of NERA at sentencing was the following statement from the judge: "The [c]ourt will grant the application for an extended term and sentence [defendant] to a term of imprisonment to the custody of the Commissioner of the Department of Corrections for a term of [eleven] years to which [NERA] shall be applicable." For these reasons, we remand the sentence and direct the judge to explain the real time consequences of defendant's sentence, pursuant to N.J.S.A. 2C:43-2(f).

Affirmed in part and remanded in part. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

26

A-2068-21